• A kitchen fire prompted the neighbors to call the authorities and Cook was subsequently "Baker Acted to Fair Oaks [and was] undergoing daily assessments by psychiatrists;"
• Cook had been mismanaging his life;
• Cook's personal health and hygiene were extremely bad;
• Cook had been in several car and motorcycle accidents;
• Cook's condominium was in foreclosure and he owed money "to many;" and
• Cook was unable to plan for his affairs or make practical decisions.
The petitioners attached a report prepared by the Palm Beach County Sheriff's Office that described the condition of *284 Cook's condominium in cringing detail upon which it is unnecessary to elaborate here.
The petitioners requested "that an examination be made as to the mental and physical condition of the alleged incapacitated person as provided by law, and that an order be entered determining the mental and physical capacity of said person." The petitioners sought a plenary guardianship for Cook.
The guardianship court issued an order appointing a three-member examining committee pursuant to section 744.331(3)(a), Florida Statutes (2017). Each member was ordered to "make such examination of [Cook] as will enable them to ascertain thoroughly [his] mental and physical condition at the time of the examination."
The members of the examining committee timely submitted their reports, each recommending a plenary guardianship for Cook. The reports were placed into evidence without objection at the hearing, and the petitioners called each member of the committee to testify.
The committee's designated medical doctor was a primary care physician (the "doctor"). He interviewed Cook and also spoke with the social worker at Fair Oaks, another member of the examining committee, and Cook's brother. He reviewed the petition, the police report, Cook's medical chart from Fair Oaks, and a note from a physician at Medicana (the facility to which Cook was transferred after his discharge from Fair Oaks). The doctor testified that Cook was seen by a psychiatrist for two weeks at Fair Oaks and had a single psychiatric consultation at Medicana. The doctor concluded that Cook was "certainly disturbed" - that he had an unspecified psychosis, cognitive issues, lack of self-awareness, and his "reality testing" was poor. The doctor testified that Cook was not being treated for his psychosis - his primary diagnosis. The medication he was on was directed at anxiety, depression and pain. The doctor testified that he did not perform either a physical or mental health examination of Cook.
The second member appointed to the examining committee was a layperson. Her examination of Cook consisted of interviewing him twice; speaking with his family members, two of his neighbors, a friend, and the social worker at Fair Oaks; reviewing his medical record from Fair Oaks; and receiving a list of his current medications and a note from his psychiatrist, which she admitted she could not read. The layperson testified that Cook was in denial about his major depressive disorder.
The third member of the examining committee was a licensed psychologist (the "psychologist"). His examination consisted of interviewing Cook twice; reviewing his medical records from Fair Oaks, the guardianship petition, the order of appointment, and a letter from one of the brothers; speaking to the other brother on the phone; consulting with Cook's primary care doctor; and giving Cook a Mini-Mental State Examination (MMSE-2) on two occasions. The psychologist testified that based on his examination, he concurred with the diagnosis Cook received upon his discharge from Fair Oaks - that Cook suffered from "major depressive disorder, unspecified anxiety disorder, and psychotic disorder not otherwise specified."
The psychologist admitted that he did not perform either a physical exam or a comprehensive mental health exam. In fact, he recommended that Cook be seen by an internist, and testified that neurological and neuropsychological exams were necessary to rule out a neurocognitive disorder. He admitted that the MMSE-2 he *285 performed is "the briefest of screening instruments for neurocognitive impairment," and that Cook's results revealed that he had no cognitive impairment.
Cook's testimony demonstrated his lack of cognitive impairment. When asked why he was feeling "poorly" at the time the psychologist conducted his second interview, Cook explained:
I think most people don't understand, and I didn't, how bad it is to be in a facility like this. I mean, I felt that, you know, the situations are that you have people screaming day and night. You can't get your sleep. You have people that are incontinent. And many other things that make having clarity of mind and so forth difficult.
And at the same time, I was conscious of the situation I'm in of this process for guardianship can affect your entire life and all of your rights, all of your property. And I was having very little say and very less knowledge of what was going on around me. And then the outcome depends on these quick little evaluations. I was very anxious because I felt isolated from the world, from knowledge of what was going on, and there was a lot of weight on the outcome. So I was anxious and concerned.
In response to follow-up questions, he detailed some of the behaviors exhibited by the other patients at Medicana. He also discussed the conduct of the night nurses insofar as they made it difficult for him to get quality sleep.
The prospective ward's testimony reveals that he was not only cognizant, but painfully aware and understandably anxious and afraid that the outcome of the guardianship proceeding would, as he explained, "take away all of my civil liberties and all of my legal rights ... and take away all of my choices and freedoms."
"Proceedings to determine the competency of a person are generally controlled by statute and where a statute prescribes a certain method of proceeding to make that determination, the statute must be strictly followed." In re Keene , 343 So.2d 916, 917 (Fla. 4th DCA 1977). The relevant statute is section 744.331, Florida Statutes (2017).
In 1989, the Legislature considered the state of guardianship law in Florida and the impact a guardianship had on the ward. The Legislature found:
Those persons currently adjudicated incompetent typically retain fewer rights than are retained by convicted felons, since most guardianship orders remove from the individual basic rights such as the rights to vote, own property, marry, consent to medical treatment, and contract ...
Preamble, Ch. 89-96, Laws of Fla.
The Legislature recognized that Florida's guardianship law contained "antiquated and imprecise statutory provisions," which resulted in thousands of prospective wards being denied due process of law. Id. As a result of these findings, the Legislature revised the law including setting forth "very specific procedures which shall be followed to determine incapacity." In re Fey , 624 So.2d 770, 771 (Fla. 4th DCA 1993). The Legislature's findings support a strict construction of the guardianship statute.
Under the statute, the examining committee's role is to assess the abilities of the prospective ward and advise the court. The statute requires that each member of the examining committee examine the prospective ward. § 744.331(3)(e), Fla. Stat. The examination must include a comprehensive examination . Id. at § 744.331(3)(f). "The comprehensive examination report should be an essential element, but not necessarily the only element, used in making *286 a capacity and guardianship decision."Id. If indicated, the comprehensive examination must include a physical and mental health examination. Id. If a mandatory aspect of the comprehensive examination is not indicated or cannot be accomplished, the committee member must expressly explain the reason for the omission. Id.
The precise language used by the Legislature reads:
The examination of the alleged incapacitated person must include a comprehensive examination, a report of which shall be filed by each examining committee member as part of his or her written report. The comprehensive examination report should be an essential element, but not necessarily the only element, used in making a capacity and guardianship decision. The comprehensive examination must include, if indicated:
1. A physical examination;
2. A mental health examination; and
3. A functional assessment.
If any of these three aspects of the examination is not indicated or cannot be accomplished for any reason, the written report must explain the reasons for its omission.
Id.
We find that the plain language of section 744.331 requires, at a minimum:
(1) An examination by each member of the committee;
(2) That the examination must include a comprehensive examination; and
(3) That the comprehensive examination must include, if indicated, a physical exam, a mental health exam, and a functional assessment.
The statute does not require three separate comprehensive examinations - rather, the statute requires a comprehensive examination.[1] The statute also does not specify who should perform the comprehensive examination. This leads us to conclude that the requisite three parts of the comprehensive examination could be performed by different specialists. We find that the statute is unambiguous, however, in its mandate that: a comprehensive examination be performed; a report of the comprehensive examination shall be filed; and the report should be an "essential element" in making the capacity decision.
Here, none of the members of the examining committee performed a physical examination of Cook; none filed a report of a physical exam of Cook; and none explained the reason for their omission of the requisite physical exam. Not *287 only is the physical examination mandated by the guardianship statute, a physical exam could reveal a physiological reason for Cook's behaviors. Because a person's physical condition can have a profound impact on his mental health, a physical examination should be made in every case unless there is an express finding by the examiner that the exam was not indicated or could not be accomplished for any reason. The committee's failure to include the physical examination in this case means the members reached their capacity determinations and advised the court without considering all of the "essential elements."
We also find that the requisite mental health examination was not performed. A prospective ward deserves a thorough mental health examination to determine whether his condition is curable or treatable. We recognize that here, the psychologist administered the MMSE-2, reviewed records from the Fair Oaks psychiatrist, spoke with Cook's primary care physician, and interviewed Cook for nearly two hours. In a simpler case, this exam might be sufficient. This case, however, is not a simple case, and, significantly, the psychologist testified that Cook needs further evaluation. If a prospective ward needs further evaluation, fairness dictates that the evaluation occur before a court is asked to make a capacity determination.
We are not reversing the incapacity decision based on a reweighing of the evidence, as argued by the dissent. We are reversing for the failure of the members of the examining committee to base their reports on the type of information required by the statute. The members of the examining committee failed to complete all required parts of their examination. They were without authority to make their reports. See Beckham v. Cline , 151 Fla. 481, 10 So.2d 419, 421 (1942). It was error for the trial court to find Cook incapacitated in the absence of a comprehensive examination mandated by the statute and it was error for the court to rely on the members of the examining committee where they reached their conclusions without considering all of the statutorily-mandated factors. We express no opinion on Cook's capacity and remand so the proper procedures can be followed before any opinions as to Cook's capacity are rendered.
We note that appellees do not argue that the requisite physical and mental health examinations were performed in this case. Instead, they argue that Cook's remedy was to object to the reports of the examining committee and move to strike them. Because Cook allowed the reports into evidence without objection, the petitioners argue that he has waived any objection to the procedure followed by the examiners. See generally Levine v. Levine , 4 So.3d 730, 731 (Fla. 5th DCA 2009). We disagree.
Each report contains an express declaration by the examiner that he or she "made a comprehensive examination" of the prospective ward. The testimony, on the other hand, revealed that none of the examiners made the requisite comprehensive examination. Because Cook could not have known what the members would say before the hearing, he did not waive his right to object to the examinations by failing to object to the reports themselves.
A petition to determine incapacity exposes the prospective ward to the possibility of losing his personal autonomy. Recognizing the vulnerability of alleged incapacitated persons, the Legislature placed safeguards in the statute to ensure that precious human rights were not removed without due process. Among those safeguards is the requirement that a comprehensive examination be performed in every case. Only upon consideration of the *288 results of the requisite examinations can the examiners make their determinations as to the capacity of an individual and advise the court.
The stakes could not be higher for the prospective ward. For this reason, those who participate in the process must strictly adhere to statutory mandates.
Here, the court found Cook incapacitated in the absence of the statutorily-required comprehensive examination. This was reversible error. On remand, the case should proceed from the appointment of a new examining committee. The order appointing the examining committee should track the language of the statute, mandating all parts of the comprehensive examination yet giving the committee members the flexibility to omit, with explanation, any part that is not indicated or could not be accomplished.[2]
Cook's status shall remain unchanged pending the outcome of the incapacity proceedings on remand.
Reversed and remanded for further proceedings .
Klingensmith, J., concurs.
Conner, J., dissents with opinion.

The dissent argues that one construction of the statute is that three separate comprehensive examinations must be performed. We agree with the dissent that such a construction would lead to an absurd result. While requiring three comprehensive examinations may be untenable, at least one is statutorily mandated. What happened in this case was not right - that the members of the examining committee, including a layman, rendered "expert" advice to the court on the capacity of the prospective ward without the benefit of any physical or mental health examination.
We think that the dissent is confusing the mandated "comprehensive examination" with the individual members' examinations. Each member must perform his or her own individual examination of the prospective ward. These examinations include meeting the prospective ward and perhaps talking to family and friends, interviewing caregivers and nurses, reviewing medical records, inspection of living conditions, et cetera. In addition, the member's examination must include a mental health exam, a physical exam, and a functional assessment. These three parts of the comprehensive examination do not need to be performed by the member, but the results must be included in the member's examination before the member can render an opinion. Thus a comprehensive examination report is a mandated part of each member's individual examination.

The dissent ponders at length the meaning of the words "if indicated," and concludes that "the statutory language 'if indicated' was meant for the judge to give guidance as to the extent of the capacity evaluation to be performed." We do not believe the trial judge, at the outset of a case and armed only with a one-sided petition, would be in any position to determine which parts of the comprehensive examination are "indicated." The statute mandates that all parts of the comprehensive examination be performed and that if any part is omitted, for any reason, the examining committee member must explain the omission.